May it please the Court, Sarah Johnson on behalf of Bernal Allen, I will be addressing only the conflict of interest issue. I know that this panel is familiar with the conflict of interest law of the circuit because many of you have sat on the panels of this circuit's decisions and the prosecution would have burned control of the outcome of this case. But if you'll look at the spectrum of these cases, we can dispose of Hernandez, Garcia-Jasso and Apodaca because in every single one of those cases you did not have an instance of a former client testifying against a current client. So what we're looking at is the parameters between Perillo at the top, which is the most egregious case, Infante, and then down to Burns. And the reason that Burns does not control this case is because, in the words of the Burns Court, the facts and issues of the previous representation had no relation to the charges brought against Burns. Well, that's not the case here. The subject matter of the former representation not only had a very direct relationship to the current charges against Bernal Allen, but it was also the subject of Eugene Allen's and Newkema Frith's testimony. So then we go up to Infante. And Infante is a case where, while the subject matters were related, and they also stem from different cases, the Infante Court specifically held that neither one of the former clients directly implicated Infante in the alleged conspiracy. Obviously, the case law is important. I don't mean to suggest that it isn't. But let's wipe the case law off the books for just a minute. Go back to its essentials. In what respect was the attorney placed in a conflict of interest such that the attorney's loyalty was not completely with the current client? As to Eugene Allen, Eugene Allen was a government witness at the federal trial against Bernal Allen. Before his testimony in that federal trial, the Jason Williams Law Firm represented Eugene Allen in five separate criminal cases over the course of nine years. That was not a transient or insubstantial relationship. Okay, but you're not really quite answering my question. That is, in what respect was the attorney's loyalty to the client compromised in any way by the facts that you've described or any of the other facts that are here? Because even though the representation of Eugene Allen had ended, Jason Williams and his law firm had a continuing duty to maintain confidentiality as to its prior representation of Eugene Allen. I think we know the law. I hope we do. Basically, the problem here is what happened. What are the facts? Facts decide cases. I think that my colleague, that's the same point he's made with you. Tell us what it was in that multiple representation that injured the client. As the law has developed, you don't have an impermissible conflict, certainly for due process purposes, constitutional purposes, without showing an impairment or an injury to the client. You agree with that. Tell us what happened. How did it hurt your client? The adverse effects of his trial. For example, at the evidentiary hearing, Jason Williams testified that he learned from Eugene Allen that Eugene Allen said, well, I didn't have that gun that I pled to when I pled over in state court. Then he gets on the stand in federal court when Williams is supposed to be representing and having full loyalty to Bernal Allen, and he doesn't bring that out on cross. What he could have done with that information is cross him on that and say, you pleaded to a felon in possession of a firearm, and you did that to get a good deal. We all know, and you've said, that you didn't have that gun. You pled guilty to something that you didn't do just to get a good deal. You sit here today before us, having pled to the Allen family conspiracy, and once again, you're just pleading to that to get a good deal. You didn't do that. You didn't conspire with Bernal Allen. You were out there hustling for yourself. And so this was a line of cross-examination that, because of his prior relationship with Eugene Allen, Jason Williams was aware of, but he failed to go into that. He handled both of these witnesses with kid gloves, instead of going after them, going after their credibility. And how this really comes out is when you look at the duration of Eugene Allen and Nekima State Court, there is a direct overlap with the federal conspiracy that was charged in this case, because, as you heard the prosecutor say in opening statement in this case, we're going to hear about a long-time family enterprise that has plagued Central City for the better part of 20 years. And even the pre-sentence report in this case dates relevant combat back to 1996. And in every single one of these instances, you have these guys, Eugene Allen, now Bernal Allen, who's sitting at counsel table, having a reprise of the same facts. And these are the same facts that Jason Williams represented Eugene Allen on time and time again in state court. Dealing drugs, carrying weapons. Mr. Court conducted a hearing when he, first of all, the judge did not know about this conflict, nor did the government know about the conflict, until after the verdict came in. Correct? That is correct. It was not brought to the Court's attention until after. And then he appointed separate counsel. That's correct. And he appointed separate counsel and conducted a full hearing and entered findings of fact. And what included in those findings of fact were such things that described the reality of the practice that's engaged here. And these are criminal defense lawyers with a carrying 60, 70 pending cases. They're not trying white-collar crime that's representing political figures and that kind of thing. This is the bread-and-butter hard world of the criminal defense lawyer. And he testified that he didn't—the client—or his testimony—that his client did not know and didn't tell him—didn't want to talk about the facts of the case. Cut me a deal. And he did. And he didn't know. And the district judge found that credible. What do we do with those facts, though? Those—these types of facts that are found here tend to show that there's no injury. I think the Court should do with those facts exactly what the Perillo Court did with the facts and say, is this—I think this Court should consider those facts the same way that the Perillo Court considered the testimony of that criminal defense lawyer and say, is that reasonable testimony? And in this instance, it was— It's not reasonable testimony. What do we do with the—these, I take it, would be findings of the fact that they're not so intermeshed with the constitutional principle that there would be constitutional facts, so there—we have to give them deference. Clearly erroneous standard, essentially. Right? But—yes. Well, it's a combined fact and law review, and so it is under de novo review. If you review the facts separately, it is clearly erroneous. But in this case, Jason Williams and his law firm represented Eugene Allen for more than nine years in five different criminal cases. And the idea that an attorney would not gain any confidential information from a client over that very extended course where he, in fact, was making many court appearances, and even if those court appearances were perfunctory matters where the case was merely reset, the reality of that practice is you go over to the box, you sit in the box with your client, you talk—it's an opportunity to talk to your client about the case. And that's frequently done over there. And so there were many, many, many meetings, opportunities. They filed many motions for Newkima Frist's case. They had a preliminary hearing. These were not fly-by-night cases where they went in once and pled guilty. These were over the course of many years. And I do think that he gained confidential information. And I think one of the aspects of the confidential information is Williams' testimony that Eugene Allen told him, well, I didn't have the gun. That's one great example of that. As I understand it, they testified that they did not know who the witnesses would be until the government filed its witness list. I mean, the formal sense is correct, I'm sure. We don't know for sure, but I find it a little difficult to understand that an able criminal defense lawyer is not going to have a pretty good idea of what's going on in that list. And so I'm not sure that they did not—my concern, in part, is that they knew going into this thing. That's been favorable to you, I think, that there were conflicts there. Correct. But, of course, they wouldn't know for sure whether the government—it's just a little formal to say that I didn't know until I got the government's list who was going to testify. The preferable way is to handle this before trial, to bring it to the court's attention, to bring it to your client's attention, to determine whether a waiver can be sought and if it can be, to seek the waiver. That is unquestionably the better way to handle this, and that was not handled here. But the Friday before trial, when the government made its Jenks disclosure, its Jenks disclosure was very thorough in that it not only listed the names of the witnesses, it listed the date, case, court, charge, and sentence for each of those witnesses' criminal history. So upon receiving this on that Friday, the Williams Law Firm had in its possession clear facts that these are the case numbers that they know that they represented these people in, and that would have been the appropriate time to do something about it, and it didn't happen that way. And, unfortunately, it was Bernal Allen who suffered for it. All right. You've saved time for a vote on this, Johnson. Thank you. Thank you. Mr. Feece, if I'm pronouncing that right, and if not, you can correct me. Oh, it's Mr. Tice. All right. So it's Tice? Tice. Tice. All right. Never would have gotten that right. No one ever does. Thank you. Good morning, Your Honors. Peter Tice. I'm representing Mr. Sonny Allen on behalf of my client. I thank you for the opportunity to be heard. Our argument is that the record was absolutely devoid of any evidence of agreement to a single unified conspiracy, and I want to just, in my brief time, analyze it under whether there was concerted activity, which is necessary for a conspiracy, or whether this was, indeed, parallel activity on the part of the co-conspirators, being out there on the street, all street-level sellers, in the same location, but engaged, but not working together. Now, we just want to go over some factors in that. One is interdependence, and the record is absolutely clear and unequivocal that there was no interdependence between these actors. And how do we know that? Well, my client was out there for 18 months during the surveillance of the case agent, Mark Henry, and none of the other co-conspirators were present. He was out there on his own, and there was no evidence of any communication between the conspirators helping him in his enterprise. On the flip side of that coin, he was absent, my client was absent during certain times, and other co-conspirators were present out there selling. Again, no evidence that they were communicating during this time before the enterprise. I also want to draw your attention to that there were many cooperating witnesses here, co-conspirators, and the government had promised the jury in the beginning, these guys are going to tell you that they had an agreement to do this. To a man, each one said, we had no agreement. We were hustling on our own. We did our own profits. We kept our own revenue. We had our own suppliers. This was not an enterprise where we were working in concert. We just happened to be there selling. The next thing was that there was no overlapping roles, which this court has drawn attention to. And how do we know that there were not overlapping roles? Well, there was testimony at trial that Bernal Allen had many persons to whom he supplied drugs. Co-conspirator Mark Grayfield, co-conspirator Casame, co-conspirator, I'm sorry, not co-conspirator, but a witness named Brandy Dwyer and another one named Miss Frith, who he all supplied during his dealing. Well, when Sonny Allen was out there by himself for those 18 months, probably more, he didn't supply them. If this was truly a concerted activity, a conspiracy, why wouldn't he step in and supply these persons? He didn't, so that is another indication that they were engaged in parallel activities rather than concerted action. And finally, I just want to talk a little bit about collaboration. What do you do with the evidence that they were taking turns? In other words, a buyer comes up and this is yours, and the next buyer comes up and this is yours. That's a little more than parallelism, isn't it? Well, to address that, I mean, that's why I cited a case that this court had decided about five years ago, a hallway case. And in that case, that was another case where the co-conspirators were taking turns. They had an agreement to take turns apparently. But this court nevertheless found that that was not sufficient evidence of a conspiracy because that alone— Sharing territory arguably would facilitate the distribution of the drugs, wouldn't it? Well, there was no evidence that there weren't other dealers on this block. There wasn't any evidence that they were taking any affirmative steps to protect the territory. There was nothing like that in the record. They just have—the only thing in the record is that they happen to be in the same place dealing drugs at the same time. Now, true, they are related. They're all members of the Allen family. So they kept—they based their location on their grandmother's house, and there's evidence that they also kept their drugs in that house. But you look at that. They didn't even have an agreement as to sharing that because they apparently stole from one another, and they certainly had separate locations within that. The witness, Kasame, whatever his—C-A-S-A-M-E, testified—I believe that they pooled money on more than one occasion. Is that correct? That's an accurate description of the testimony. Among all the co-conspirators, he provided that testimony, which, you know, before I talk about the significance of that appeal, I think in the courtroom, that was clearly incredible. Now, whether that's incredible as a matter of law and appeal, I didn't draw attention to this in my brief, and I apologize for this, but I was looking at the record again in preparation of this argument, and he testified that that pooling occurred in 2007 from a man named Big Ike and also maybe occurred in 2010 or 2011 from Big Ike. Now, Big Ike testified at trial that he did not start supplying these co-conspirators until 2011. So it's almost impossible that he actually witnessed that because Big Ike himself said, you know what, I wasn't even dealing drugs to these defendants at that time. And you look at the rest of the evidence, no one else said that. Now, even if we have to take that evidence as true for purposes of appeal, I think we need to look at the whole context. This was a conspiracy that spanned from 2007, as charged by the government, all the way to 2013. Six years, there was testimony that my client and the other clients independently would be supplied by this Big Ike character and others always independently. But over that six years, which would involve hundreds and hundreds of purchasing from suppliers, I think the testimony of one or two times pooling is insubstantial in light of the other evidence to conclude that they were a concerted action. I think here the closest analogy I can find is, you know, these are vendors in a flea market or the French market. They may all have, you know, the same goal of selling their goods to people who come by, but they're not a conspiracy to sell those goods. They're all in parallel to one another with their own goals, their own suppliers. There was even testimony that they had their own customers. So this is absent further evidence of some sort of collaboration between these individuals, which the co-conspirators, again, did not provide. The verdict can't stand. I don't know that you're answering the question of a non-compete arrangement, which is translating sort of antitrust principles in the drug trade. But non-compete does facilitate the distribution of the product here, for sure. So I'll concede there's some facilitation there. That may not be enough alone, but you also had to have a common stash in your place, didn't you? There were stashes. That's where they put the drugs in my mama's house. They had a separate stash, but I would have you look at the fact that this was their grandmama's house, and they were doing it out of convenience. They weren't doing it together. It's like, what stash are you here? It's like, oh, this is my grandma's house. I'm going to put it here. And they did put it in different places. And there was testimony that if they didn't hide it well enough, they would steal from one another. That's just simply not what conspirators do. That's what people competing do. That's what people who are not in concert with action do. Thank you, Your Honor. All right. Thank you, Mr. Patrice. Ms. Flager? Flager or Flager or something else, if you can please correct me also, if you would. Flager. Flager. All right. Thank you, Your Honor. May it please the Court. Ada Flager on behalf of Jai Preston. Mr. Preston raised several issues on appeal, all of which he maintains, but I'll focus on Issue 1 and specifically on the district court's error in failing to suppress the fruits of the December arrest, which in our office we affectionately refer to as the screwdriver arrest. The district court erred both in determining that there was reasonable suspicion for the stop and in determining that the stop was conducted in a reasonable manner and thus was not a de facto arrest. Your client is sort of situated, in fact, is derivative of Sonny Allen. You came later into this arrangement, whatever it was. So if that arrangement was more than conscious parallels and was a suspicious concert sustained in jury's finding conspiracy, then you're hooked as well. Is that fair? I would concede that, Your Honor. Turning back to the Fourth Amendment issue, the officers were unreasonable first in stopping Mr. Preston and Mr. Williams without reasonable suspicion. They had the right to stop and question, didn't they? I mean, they saw him in an argument with his one hand raised and a screwdriver in the other. Absolutely, Your Honor. They had the right to stop and question him. However, that isn't what happened in this situation. Officers are bound in any Terry stop to use the least intrusive means necessary to respond to the situation. Which escalated. It escalated by the police, in fact. The officers could easily have walked up to the men and asked, what's going on? They didn't do that. Instead, they jumped out of their cars, hands on their weapons, shouting profanity-laced commands and ordering Mr. Preston to lie face down on the sidewalk. All before they'd asked either of the men any questions. These men were friends. They both maintained that they were not arguing. Mr. Preston— You've got to look at it from an objective perspective of the police, not what subjectively was going on. Exactly, Your Honor. And at the point that the officers affected the stop, those are the facts that we look at in determining whether there was reasonable suspicion and also whether the officers responded reasonably to the suspicion that they had. At that point, the officers concede— If it had been a knife, would your position be different? I think the position might be different in that situation as to the reasonable suspicion. In this case, the officers did not know what Mr. Preston was saying. They saw only the back of his head, and rather than getting out and asking a question or learning from the men what was going on, which was their stated purpose, they say that the only reason that they intervened was to de-escalate what they saw as a potentially volatile situation. Instead, they did the exact opposite of that. They turned a situation in which they didn't have all the facts, and had they had all the facts, wouldn't actually have been a volatile situation, and turned it into what, unfortunately, current events continue to show us is a very dangerous and volatile situation for everyone involved. The least intrusive means for affecting this stop would have been— What if he'd stabbed him? I mean, you're setting a pretty high bar, it seems to me, for the police. I mean, what if he'd stabbed him? I mean, it was—they didn't know. Your Honor, they didn't know. He was holding a screwdriver at his side, not a weapon. They didn't know what either of the men were saying, what the relationship between the men was. And, I mean, quite candidly, this isn't a situation that would happen to me. It isn't a situation that would happen probably to anybody else in this room. There is an implicit assumption in the finding of reasonable suspicion and in the finding that the police action was reasonable, assuming that a black man holding a screwdriver— What do you think has anything to do with Rice? I don't think color of the skin has really put a penalty on him. There may be some prejudice there. I don't know. But a screwdriver can be a deadly weapon, and no one's really serious in protecting these people who aren't dealing in drugs. The real argument is they weren't dealing in a way that would add to their charge. So you're in a high-drug area. Police officers can be in a conversation. The guy's sitting there with a screwdriver in his hand, and he doesn't have any tools to work with. That's a weapon. It's kind of hard to conclude otherwise. At least a regional police officer is going to have to assume that. Well, respectfully, Your Honor, the police at the time of the stop did not know or recognize Mr. Preston or Mr. Williams, so they say on the record repeatedly that they did not suspect any other criminal activity. So respectfully, the idea that they were potentially dealing drugs cannot be considered as part of the reasonable suspicion. Second, neither of both officers, and I think in particular Officer Nunnery, says that they did not investigate or determine whether or not there was a reasonable reason for Mr. Preston to have a screwdriver in his hand. They did not look around to see whether he was working on anything. So the link to making this obviously a weapon rather than a tool, or as was actually the case, something that Mr. Preston found on the ground and determined might have some value, requires a leap in logic that is not available in determining reasonable suspicion at this time. You only have a minute left. I don't think your Fourth Amendment argument is especially strong, but it seems to me the strongest part of your case is insufficiency on count two. Would you address that, please? Yes, Your Honor. Let me turn to that. What specific issue, Your Honor? Well, that there's insufficient evidence of a conspiracy to possess firearms in furtherance of Preston's use of a phone to facilitate the drug conspiracy. The verdict form the jury checked off doesn't make sense. I agree, Your Honor. I'm trying to determine what the question is. The government knows that. I can see that the— I mean, the focus on the use of a phone wasn't facilitated by possession of a firearm. At least, as I understand, that's one of your sub-arguments, and I think you may disagree. I think it's your strongest argument rather than Fourth Amendment. I certainly don't disagree. I just didn't see a nuance or a particular question from the court on that issue. It seems quite clear to me that jury verdict form, as Judge Higginbotham points out, doesn't make any sense. So I apologize for not addressing that first. I just didn't see the oral argument hook for that issue. Is there a particular question? All right.  Thank you, Your Honor. Ms. Flager and Mr. McLaren. And all three appellants have saved time for rebuttal, by the way. I forgot to mention that. Good morning. May it please the Court. My name is Ryan McLaren, and I represent the United States on this appeal. I'm joined this morning by Andre Lagarde, who was trial counsel on this case. I'd like to begin with the conflicts issue, and I'd like to first point out by stressing that, as this Court has stressed in cases like Burns, the primary concern in cases where an actual conflict has been alleged is whether trial counsel was burdened by their former representation. Here, the single most important finding by Judge Duvall with respect to the conflicts issue was at ROA 2781, where he found that Jason Williams and Nandi Campbell were, quote, vigorous and effective advocates for their client, Burnell Allen, throughout the trial. Judge Duvall made this finding after having observed Williams and Campbell throughout the trial, including Williams' cross-examination of Nekima Frith, where Williams successfully elicited testimony that Frith hoped to receive a sentence reduction in exchange for her testimony. Campbell's cross-examination of Eugene Allen, where Campbell turned Eugene into a defense witness and used parts of I think I might need the criminal history of the witnesses that was put on the stand, I assume. Correct. Yes, Your Honor, that's correct. But they did not know, they did not see anywhere in the records who was representing them? Well, and, Your Honor, I think that gets to a point that was made by opposing counsel, and I'd like to, for the sake of clarity, I believe My direct question is, did the government know or not know of this conflict when the trial started? And, Your Honor, that's exactly the point. I believe you stated when opposing counsel was up here that the government didn't know. And just for the sake of clarity, it's not clear from the record, but having discussed this with trial counsel, the government found out about the potential conflict the Friday before trial when they were preparing the jinx and the Giglio material. Again, this is not clear from the record, but the government discussed the potential conflict with Mr. Williams the Monday of trial, as did defense counsel, and that is in the record, the testimony of Billy Southern and Robert Toll at the evidentiary hearing. Both came away from that discussion with Mr. Williams that no conflict existed. Does that answer your question, Your Honor? Okay. So going back to what Judge Duvall observed of Williams' and Campbell's representation of Brunel Allen at the trial, they also witnessed Williams' closing, in which Williams focuses again on the strategy of distancing, Brunel Allen from the drug conspiracy, saying things like he's not a choir boy, but he is not guilty of counts one and two, the conspiracy counts. After observing Williams' and Campbell's representation, and after a day-long evidentiary hearing in which eight witnesses testified and were subject to cross-examination, including Jason Williams and Nandi Campbell, Judge Duvall issued a 28-page order in which he, again, to quote Judge Duvall, found that they were vigorous and effective advocates for their client. If the point of this analysis is to determine whether trial counsel was burdened or whether they pulled any punches, then Judge Duvall's findings at page 2781 are significant. Also significant are Judge Duvall's findings that opposing counsel's Monday morning quarterbacking, their proposed alternative trial strategies were, quote, befuddling and bewildering, and that they were insufficient to satisfy this Court's standard for an actual conflict. Many of Judge Duvall's findings are based on factual determinations and credibility calls, such as his determination that Jason Williams' testimony at the evidentiary hearing was credible, as was Nandi Campbell's. What about her argument that Mr. Williams knew that his former client had said, I didn't possess the gun, then pled guilty to it in state court? Well, Your Honor, I believe that that would only speak to one of the Parillo factors. There's still the three remaining Parillo factors, and even that only goes to show whether there was a conflict. As this Court has stated, the test is whether there was not only just was there a conflict, but were there adverse effects on the defendant's representation at trial that were the result of that conflict. I think that point made by opposing counsel only speaks to one of those Parillo factors, but there's still Judge Duvall's findings that the three other Parillo factors are in the government's favor. Opposing counsel has pointed to nothing in the record that demonstrates that Judge Duvall's factual findings and credibility determinations were in error. In fact, going back to what you said, Judge Higginbotham and Judge Smith, facts, facts, facts, where's the injury here? The opposing counsel has not pointed to any alternative trial strategies that would have been necessary, or in fact, as Judge Duvall found, that wouldn't have been counter to Bernal Allen's trial strategy, which was to distance himself from the drug conspiracy. As a result, any conflict was speculative or hypothetical, exactly what this Court has deemed insufficient in cases such as Bern's. To be clear, we're talking about constitutional conflict, not conflicts as defined by the Code of Ethics. Your Honor, that's exactly right. This is the test for an actual conflict. They're not the same. You can have an ethical violation. I believe, maybe I'm mistaken, but it may not be a constitutional violation because of the requirement of additional burdens. It doesn't mean that lawyers are free to do these things. Our question is whether there's a constitutional violation to upset these, whether it burdened the client, his client. What about the guy on the stand? See, we're not talking about his problem. We're talking about that. Your Honor, that's exactly right. The test put forward by this Court is whether there was a conflict according to the Parillo factors and whether there were adverse effects that resulted from that conflict. Some ethical test or code of conduct, that isn't present in the Parillo factors. It's the four factors that this Court has described in Parillo. Moving on to sufficiency, opposing counsel has stated that the record is totally void with evidence that there was a single conspiracy, and that's just not the case looking at the record. Beginning at page 542, Judge Duvall has a thorough 23-page order addressing sufficiency. The existence of one conspiracy versus multiple conspiracies, as this Court has stated, is a finding of fact, and there were sufficient facts in the record to support a finding of a single conspiracy. Most importantly, page 1712, that's co-conspirator Emanuel Casame's testimony, as Judge Higginbotham highlighted, where Casame talks about the two or three times he saw Sonny Burnell and Preston pooling their money together by counting it on a bed in their grandmother's house, then going to a supplier. And he may have said Big Ike Thompson in the testimony. He may have been getting the names confused. But pooling their money together in order to go to a drug supplier, then returning with the cocaine that they would cook into crack and then hide in the stash at their grandmother's house. In addition to that, there is at R.O.A. 1437, Allen family customer Newkema Frith testified that she could buy from any one of the three of Burnell, Sonny, and Preston, and that they did not fight over her business. R.O.A. 1627, co-conspirator Rayfield saw Burnell, Preston, and Sonny hiding their drugs around their grandmother's house, specifically in the backyard. And then there's multiple witnesses that testified that they saw Burnell Allen, Sonny Allen, and Preston selling cocaine in front of the grandmother's house, selling crack in front of the grandmother's house every day. As you pointed out, Judge Higginbotham taking turns with what appeared to be a non-competer sharing the territory in such a way that would facilitate their drug business, their enterprise. I'd like to briefly address the phone count that Judge Smith brought up. At page 557, Judge Duvall begins his analysis of the phone count in which he cites decisions by this court. As Judge Duvall states in his analysis, conspiracies need only to be temporally and spatially related, not linear and literal. Further, the in furtherance of language in 924 is interpreted broadly to mean any action that advances or helps the drug trafficking offense. So in this case, this was not a gun conspiracy in furtherance of a phone call, but instead a gun conspiracy in furtherance of the drug conspiracy of which the phone call and other phone calls like it were a part. You count two of Preston. You look at that verdict form. Why shouldn't we read that literally? You have to back up and try to come up with a lot of other explanations. The jury checked off that. That's what they checked off. Perhaps it's just an error in the way the verdict form was constructed, but the jury chose that one. So now we have a verdict which we take literally as it reads. It doesn't really make much sense to me without a lot of extrapolation. Well, Your Honor, I think the reason to not read it literally is because, as this court has said, conspiracies don't need to be temporally and spatially or only need to be temporally and spatially related. They don't need to follow one after the other. The conspiracies in this case kind of bleed into each other. It's not the one conspiracy and then the conspiracy after it. Just looking back to Judge Duvall's analysis of this, it's not a gun conspiracy in furtherance of a phone call. It's the gun conspiracy in furtherance of the drug conspiracy, and the phone call is just a part of the drug conspiracy. That's not what the form says. I apologize, Your Honor. I understand your theory, and it would be obviously sustainable otherwise, I think. I have difficulty in making sense of it. If we can't make sense of it, why shouldn't we just vacate its account too and send it back for resensing, as to Preston? Your Honor, I think it's not that. The only way that we can't make sense of it is if we look at it linearly and look at it as Preston has phrased it, as the gun conspiracy in furtherance of the phone call. That's just not the case. It's the gun conspiracy in furtherance of the drug conspiracy. If you look at it like that, I think that makes sense. Moving on finally to the suppression issue. First, I'd just like to say this, and I believe that Judge Owen, you addressed this. There's no indication of race in the record. It was not argued at the suppression hearing, and as Judge Owen, you said, I don't think that this has anything to do with race. I'll start at page 693, where officers Gillard and Nunnery, the officers who searched Preston, begin their testimony. And according to the officer's testimony, they saw Preston screaming, yelling at Williams, and holding a large screwdriver in a high crime area. They could hear Preston yelling through their closed car doors and windows. They saw Preston looking around for an escape, and when they ordered Preston to drop his screwdriver multiple times, he refused to do so. And Judge Owen, as you said, this escalated the situation. This is enough to establish reasonable suspicion, and in fact less than this has been sufficient to establish reasonable suspicion. And I'll point to this Court's decisions in Wiley and Wilson, cited on pages 29 and 30 of our brief. Further, the officers' actions were not unreasonable. Their actions, using some force, pointing a weapon at a suspect, ordering a suspect to the ground, handcuffing a suspect, have all been approved almost to a T by this Court in Campbell, which is cited on page 31 of our brief. This case is no different from Campbell, and there should be no different outcome as in Campbell. Judge Duval's conclusions as to the suppression issue, specifically the Terry issue, should be affirmed. If there are no further questions, I'll briefly conclude. For every one of the issues raised by the three defendants, including the conflicts issue, the suppression issues, and the sufficiency issues, Judge Duval made factual determinations and credibility calls and wrote extensively ruling in the government's favor. For example, for the conflicts issue, Judge Duval held an evidentiary hearing where eight witnesses, including Jason Williams and Nandi Campbell, testified and were subject to cross-examination. And following the hearing, Judge Duval credited Williams' and Campbell's testimony in a detailed 28-page order. There was a similar hearing for the suppression issues in which 11 witnesses testified, and Judge Duval wrote a 31-page order in a detailed analysis rejecting every one of the arguments put forward by opposing counsel here today. The defendants have not pointed to anything in the record that indicates that these findings and credibility calls by Judge Duval are clearly erroneous. For these reasons and for the reasons stated in our brief, the government respectfully requests that this Court affirm the convictions of all three defendants. Thank you. All right, thank you, Mr. All right, so each of the appellants has reserved only one minute for rebuttals, so let me just warn you to go ahead and get right to the point and focus only on what you can say in one minute, unless there are questions from the Court. First, I would like to correct a misstatement of the record by opposing counsel. There was no consensus as per the record of the evidentiary hearing that Jason Williams and or Nandi Campbell had talked to the government or talked to defense counsel and decided that there was no conflict. There's no testimony from anybody from the government that that conversation occurred, and the two counsel for the co-defendants expressly refuted Jason Williams' account of that conversation. The record is clear that Williams and his law firm knew of the potential for the conflict before the Jenks disclosure, but at the time of that Jenks disclosure, it should have become unmistakably clear. I want to then go to the other potential adverse effect. One of the things that Mr. McLaren mentioned in his argument was the fact that Williams drew out from Newkema Frith her motive or the fact that she might get a reduction from testifying. Well, that is the bare minimum you can do on cross-examination of a cooperating witness. What would have been much more powerful is to establish her motive for that reduction. Nandi Campbell testified at the evidentiary hearing that Newkema Frith was angry, and she was very upset about having to eat all of that time, 9 years flat. And the reason that sentence was 9 years flat is she was getting multiple bills for 2008 and 2009 crack possession convictions that are the heart of what this conspiracy is about, Bernal Allen's drug sales to Newkema Frith. And she expressed that anger in court. She expressed that anger to her attorney. She was never cross-examined. Thank you. Mr. Tice. Thank you, Your Honor. I don't have anything particular to rebut. We concede all the facts that they cited, the record citations. We just say it doesn't add up to a conspiracy. I would just invite this Court to think of it, a thought exercise. Let's take this out of the criminal context, take it to a business context. In a civil context, is this a business enterprise? Should each one be held liable for the acts of the other? If one committed a tort, will we find the other one? Will we hold her responsible? I think under these facts, for their long absences, each doing their own independent work, that wouldn't be the outcome. If there's no further questions, I'll let you go. Thank you, Mr. Tice. And we notice that you're court appointed, and we wish to thank you for your willingness to take the appointment and for your good work for your client. Ms. Flager? Thank you, Your Honors. Just a brief point to Judge Higginbotham's questions about the sufficiency on the phone count in furtherance of the gun count. While it's possible that the government can come up with an idea of what the jury might have thought that would have allowed for a conviction, certainly that cannot be the basis for this court reading a conviction into what is clearly a nonsensical verdict form. All right. Thank you, Ms. Flager. Thank you. Your case is under submission. Next case, United States v. Dix.